IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs February 19, 2015

**STATE OF TENNESSEE v. ROGER JAMES LEE ARNOLD**

**Direct Appeal from the Criminal Court for Sullivan County**
**No. S61190     Robert H. Montgomery, Jr., Judge**

**No. E2014-01165-CCA-R3-CD-FILED-AUGUST 24, 2015**

A Sullivan County Criminal Court Jury found the appellant, Roger James Lee Arnold, guilty of burglary of an automobile; theft of property valued over $1,000; and vandalism of property valued over $1,000. The trial court imposed a total effective sentence of eighteen years. On appeal, the appellant contends that the indictment failed to provide sufficient notice that the State was proceeding under a theory of criminal responsibility and challenges the sufficiency of the evidence supporting his convictions. Upon review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court are Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and D. KELLY THOMAS, JR., JJ., joined.

Randall D. Fleming, Kingsport, Tennessee, for the appellant, Roger James Lee Arnold.

Herbert H. Slatery III, Attorney General and Reporter; Lacy Wilber, Senior Counsel; Barry P. Staubus, District Attorney General; and Teresa Nelson, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**I.  Factual Background**

The appellant's convictions stemmed from the burglary of a Chevrolet Trailblazer, theft of the vehicle, and vandalism of the vehicle and a house.

At trial, James Lample testified that his daughter, Sharon Gabler, had been married to the appellant but that at the time of the offenses, they were divorced. While Gabler and the appellant were married, they lived on Egypt Road in Bristol in a house that had been purchased by Lampler and his wife. During the marriage, the appellant and Gabler purchased a 2006 Chevrolet Trailblazer. In 2010, Gabler and the appellant separated, and she continued to live in the Egypt Road residence. Gabler kept the Trailblazer, but, around 2011, Lample's name was put on the title. Lample estimated that the value of the vehicle was $7,000.

Lample said that around 8:30 or 9:00 on the evening of October 31, 2011, Sullivan County Sheriff's deputies came to his door and asked if he owned a 2006 Chevrolet Trailblazer. When Lample responded affirmatively, the deputies asked if he knew the vehicle's whereabouts. Lample replied that Gabler drove the vehicle and that it should be at her residence. Lample said that he called Gabler and inquired about the vehicle. Gabler told him that the vehicle was outside; however, after looking, she then told him that the vehicle was gone. Lample denied giving anyone but Gabler permission to do anything with the vehicle.

Lample said that around 8:00 the following morning, he saw the vehicle in the parking lot of a Walmart on Volunteer Parkway in Bristol. The vehicle was covered with purple spray paint, and all four tires were slashed. Lample said that Gabler had the four tires replaced. Later that day, Lample went to the Egypt Road residence and saw purple spray paint on the brick, windows, and a door on the lower left side of the house. Lample and Gabler cleaned most of the paint from the vehicle and from the windows and door of the residence.

On cross-examination, Lample said that he determined the value of the vehicle by looking in the "Kelly Blue Book." He acknowledged the Trailblazer was "a salvage vehicle" and said he did not know how much Gabler and the appellant paid for it. Lample said that he did not pay Gabler for the vehicle.

Sharon Marie Gabler testified that sometime around 2006 or 2007, she and the appellant, who were married, moved into the Egypt Road residence. They separated in January or February 2010. After the separation, the appellant drove a 2005 Chevrolet Silverado truck, and Gabler continued to drive the Trailblazer, which initially was jointly owned. Gabler said that both she and the appellant had keys to the Trailblazer. Sometime after the divorce, Gabler had the vehicle titled in Lample's name "for insurance purposes."

Gabler said that in August 2011, she and the appellant attended mediation to settle the division of their property. During mediation, Gabler agreed to pay the appellant $2,300; however, as of October 31, she had not paid the appellant. Gabler said that she had not

spoken with the appellant since the mediation.

Gabler said that on October 31, she arrived home between 8:20 and 8:30 p.m. and parked the Trailblazer in the driveway. She could not recall whether she locked the vehicle. Sometime thereafter, her father called. When Gabler looked outside to confirm the location of the vehicle, she discovered that it was gone. She testified that she had not given anyone permission to take the vehicle. She recalled that before her father called, she heard the squealing of tires outside; however, she lived on a busy road and had not been concerned about the noise.

Gabler said that when she woke the following morning, she saw that purple paint had been sprayed on her house. She identified a photograph that showed purple spray paint on the windows, door, and bricks. Later that morning, she saw the Trailblazer in a Walmart parking lot. All four tires were flat, and the vehicle was covered with purple spray paint. She saw no signs of forced entry to the vehicle. When she looked inside the vehicle, she noticed that a portable digital video disk (DVD) player and a global positioning system (GPS) were missing. She estimated that the DVD player was worth $120, and the GPS was worth $100. She paid $400 to replace the four tires.

Gabler said that an estimate of the cost of repairing the paint damage to the vehicle was $948. An estimate of the cost to have the house pressure washed was $400. She was unable to afford the repairs, so she and Lample attempted to remove the paint; however, some paint remained on the vehicle and on the house.

On cross-examination, Gabler said that the Trailblazer was "a salvage vehicle" that she and the appellant bought in Ohio. She could not recall how much they paid for the vehicle.

Gabler said that her divorce from the appellant was final on March 20, 2012. According to the marital dissolution agreement, she was to pay the appellant $2,300 at a rate of $100 per month. She acknowledged that she had not done so. Gabler denied leaving her keys in the vehicle on the night of the offenses. She said that she had the original key and that the appellant had an extra key.

On redirect examination, Gabler said that although she could not recall the exact purchase price of the Trailblazer, she knew they paid over $1,000.

Diana Hale testified that she lived on Elizabeth Ann Circle, which was "directly off" Egypt Road, and that her yard and Gabler's yard "touch[ed]." Hale occasionally saw the appellant around the neighborhood while the appellant and Gabler were married, but Hale did not see him between January 2010 and October 2011.

Hale said that around 8:30 on the evening of October 31, her family drove home after Halloween trick or treating. Hale's husband was driving, and Hale was in the front passenger's seat. When they turned onto Elizabeth Ann Circle, Hale saw a dark-colored, midsized car parked close to the stop sign at Egypt Road. She had never seen the car in the neighborhood before that night. She was unsure of exactly how many people were in the car but could ascertain that more than one person was in the car. She recognized the appellant, who was sitting in the driver's seat of the car.

On cross-examination, Hale acknowledged that she testified at the preliminary hearing that she "thought" she recognized someone in the car. Nevertheless, she asserted at trial that she was "pretty sure" the appellant was the driver of the car. She said that she was approximately fifteen feet away from him and saw his face.

Bristol Police Detective Danielle Eller testified that during the investigation, she obtained security footage of the Walmart parking lot from the night of October 31. Four video cameras, each with different vantage points, covered the parking lot. The security footage captured the vandalism of the Trailblazer. However, the video was "too grainy" to identify definitively the perpetrators.

Detective Eller said that she spoke with the appellant on November 30, 2011, at the police department. After she advised the appellant of his Miranda rights, he gave the following statement:

> I make this statement of my own free will and without threats made to me or promises extended. I, Roger Arnold, and my girlfriend went to Walmart in Bristol, Tennessee on Volunteer Parkway on the night of October 31st, 2011, Halloween. Chevelle Hackett and I were driving my truck that night. After leaving Walmart[,] my good buddy, Mark, called and needed a ride. I don't know Mark's last name. Mark had a friend with him I do not know either. The four of us then went to Kmart in Kingsport and I dropped Mark and his friend off at Model City Apartments.

Detective Eller said that during the conversation, she was able to "get a good look at" the appellant. Thereafter, when she watched the surveillance video of the Walmart parking lot, she was able to identify the appellant.

The security video was shown to the jury. Detective Eller said that the security footage showed the Trailblazer arriving at the Walmart parking lot at 8:48:26 p.m. The

vehicle parked in the lot located beside the grocery entrance at 8:48:37 p.m. The appellant and a female arrived at the parking lot in a dark-colored car at 8:48:48 p.m. and parked in front of the grocery entrance eleven seconds later. At 8:49:30 p.m., the appellant and the female walked into the store. At 8:51:15 p.m., the two men who had been inside the Trailblazer began to circle the vehicle on foot. Approximately one minute later, the men threw an object on top of a gray storage facility located near the vehicle. Afterward, the men walked to the appellant's car. At 8:53:36, the appellant and the female walked out of the store, and, along with the two men, got into the appellant's car. The appellant drove past the Trailblazer before leaving the parking lot.

Detective Eller said that when she went to the scene, she discovered that the item that was thrown on top of the storage facility was a can of purple spray paint. She was unable to obtain fingerprints from the spray can.

On cross-examination, Detective Eller stated that in the course of her investigation, she learned that the two men shown on the video were Gabriel Housewright and Mark Harrell.[1] Detective Eller interviewed Housewright in November 2012 and advised him that if he gave a truthful statement, she would not pursue criminal charges against him.

Gabriel Housewright testified that he first met the appellant sometime before October 31, 2011, when he and Harrell went to McGee's Auto, where the appellant worked. Housewright had seen the appellant "[o]nce or twice" prior to the night of the offense.

Housewright said that on the evening of October 31, the appellant came by Model City Apartments and picked up Housewright and Harrell. They went to McGee's Auto and then to the appellant's mobile home. The appellant's girlfriend was at the mobile home when they arrived. The appellant talked about his divorce and said that the Trailblazer belonged to him, that he had a key for the vehicle, and that he wanted the vehicle back. Housewright said that the appellant and Harrell "kind of were talking that led into the big scenario." Housewright said he could not hear the entire conversation, but he recalled the appellant's telling them where the Trailblazer was.

Housewright said that he, Harrell, the appellant, and the appellant's girlfriend went to Kmart "to get masks and stuff," but they did not purchase anything. Housewright knew the appellant had a black pickup truck but that night they rode in the appellant's four-door sedan. After they left Kmart, the appellant left Housewright and Harrell "at a stop sign at this lady's house." Housewright said, "I had suspicions we was going out there to get the car." They walked toward a house. Harrell jumped over a fence and sprayed paint on the side of the

---

[1] The transcript refers to "Mark Harold." However, the indictment spells the last name "Harrell." We have chosen to use the spelling used in the indictment.

house. Housewright said that the appellant had given them the spray paint. The men then walked toward the Trailblazer, which was parked in front of the house. When a light came on inside the house, Housewright ducked. Harrell got into the driver's side and unlocked the passenger's door for Housewright. Harrell started the vehicle with the key the appellant had provided, and they drove away.

Housewright recalled that they "spun the tires pulling out." When they reached the stop sign, an officer in a police cruiser behind them activated the cruiser's blue lights to initiate a traffic stop. Although Housewright told Harrell to stop, Harrell turned right, drove onto the highway, and "kept going." The officer pursued, but the men eventually evaded the officer by driving into a subdivision. Harrell called the appellant and said he and Housewright were going to Walmart. When they arrived, Harrell parked in the lot beside the store. They spray painted the vehicle, stabbed the tires, and threw the spray paint cans on top of a storage facility. Immediately thereafter, they rendezvoused with the appellant, who was also at Walmart. The appellant drove the men back to his mobile home. As they left the parking lot, the appellant drove past the Trailblazer. Housewright said that they had taken "DVD things" from the Trailblazer and that they put the items underneath the appellant's mobile home. They also buried the key to the Trailblazer near the mobile home. Housewright did not recall a GPS being in the vehicle. After they were finished, the appellant drove Housewright and Harrell back to Model City Apartments in his black truck.

On cross-examination, Housewright said that he gave a statement to the police on November 8, 2012, and was told that if he gave a truthful statement, he would "have no charges pressed upon me." Housewright acknowledged that he did not have a conversation with the appellant about vandalizing the house or the Trailblazer.

Housewright testified that he thought they had two cans of spray paint: one blue and one white. He also thought the cans came from the appellant's mobile home. Housewright said Harrell did all of the spray painting, stabbed the tires of the Trailblazer, and took the DVD player from the vehicle. Housewright clarified that Harrell and the appellant buried the key to the vehicle.

The appellant testified that he was not involved in the theft or the spray painting of the house and vehicle. He said that he and Gabler were married on September 9, 2009, and that in 2011, they went through a "messy" divorce. During the divorce, they fought over who would receive the Trailblazer and a Mitsubishi Eclipse. Sometime after the divorce, the appellant gave his key for the Trailblazer to Gabler's mother. The appellant said that Gabler had not paid him the $2,300 required by the marital dissolution agreement.

The appellant said that on the night of October 31, 2011, he and his girlfriend, Chevelle Hackett, drove from his home in Church Hill to Bristol around 6:30 or 6:40 p.m.

Along the way, they stopped at a McDonald's for supper. While they were eating, Harrell called and asked about the appellant's plans for the evening. The appellant replied that they planned to go to Walmart and Kmart. Around 8:40 p.m., the appellant and Hackett went to Walmart, where they encountered Housewright and Harrell. The two men told the appellant to drive around the side of the building "to look at something." The appellant drove past the Trailblazer and saw what the two men had done.

The appellant said that the group left Walmart and went to Kmart to look at Halloween masks. Afterward, he drove Housewright and Harrell to Model City Apartments.

The appellant denied giving Housewright or Harrell cans of spray paint. He further denied being on Egypt Road or seeing Hale on the night of the offenses. He acknowledged that he had seen Housewright and Harrell earlier that day at the auto store.

On cross-examination, the appellant said that the divorce agreement provided that Gabler was to receive the Trailblazer in exchange for paying the appellant $2,500. The appellant said that Gabler had paid only $200. The appellant acknowledged that he and Gabler purchased the Trailblazer for approximately $2,300, which "was at salvage value."

The appellant said that while he was at McDonald's, he told Harrell he "was going to the Bristol Walmart on the Parkway." The appellant said he was not aware that he, Harrell, and Housewright arrived at Walmart within twenty seconds of each other. He said he met Housewright and Harrell at his car after Harrell called and told him to hurry and exit the store. The appellant acknowledged that his statement to Detective Eller that he was driving his truck that night and that Harrell called after the appellant left Walmart was not correct. He explained that the statement was taken thirty days after the incidents and that his memory was poor because of his medication. The appellant said that he was not allowed to make changes to his statement but that he initialed certain changes at Detective Eller's request. He acknowledged that he signed the statement but denied seeing the language on the form that the statement was "true and accurate" and that he had "been given the opportunity to make any changes or corrections."

The appellant said that Detective Eller told him after he gave his statement that the Trailblazer had been stolen and vandalized. The appellant said that when he drove by the Trailblazer that night, he noticed the flat tires but not the spray paint and asked Harrell why he did it.

The jury found the appellant guilty of burglary of an automobile; theft of property valued over $1,000; and vandalism of property valued over $1,000. The trial court imposed a total effective sentence of eighteen years. On appeal, the appellant contends that the indictment failed to provide sufficient notice that the State was proceeding under a theory of

criminal responsibility and challenges the sufficiency of the evidence supporting his convictions.

## II. Analysis

### A. Indictment

The appellant alleges that the indictment failed to sufficiently put the appellant on notice that he would be tried under a theory of criminal responsibility. In response, the State contends that the indictment did not need to specify that the State would proceed under a theory of criminal responsibility and that the indictment provided sufficient notice of the charges the appellant faced. We agree with the State.

The Sullivan County Grand Jury returned a multi-count indictment against the appellant, charging him with four offenses. Count one alleged that the appellant "on October 31, 2011, . . . did unlawfully and feloniously enter an automobile owned by James Lample without the effective consent of the said owner and with the intent to commit a theft . . . ." Count two alleged that the appellant "on October 31, 2011, . . . did unlawfully, feloniously and knowingly obtain property of James Lample, having a value of $1,000 or more, without the effective consent of the said owner and with the intent to deprive the said owner thereof . . . ." Count three alleged that the appellant "on October 31, 2011, . . . did unlawfully, feloniously and knowingly cause damage to or destroy real or personal property, to wit: vehicle and home owned by James Lample, without the effective consent of the said owner, causing damage in the amount of $1,000 or more . . . ." Finally, count four alleged that the appellant "on or about the 31st day of October, 2011, . . . did unlawfully, knowingly, feloniously and with intent to provide aid to Mark Harrell and Gabe Housewright (herein named but not indicted), and with knowledge or reasonable grounds to believe that the said Mark Harrell and Gabe Housewright had committed a felony, did aid Mark Harrell and Gabe Housewright in attempting to avoid arrest, trial, conviction or punishment . . . ."

Prior to jury selection on the day of trial, the State announced that it would proceed under a theory of criminal responsibility. Defense counsel complained that the State failed to allege criminal responsibility in the indictment, contending "that's a new theory to me that they're bringing up today." The court agreed that the State did not "indict it that way" and that the indictment mentioned only the appellant, not anyone else. The State asked for a continuance, which the trial court denied. However, the court allowed a fifteen-minute recess.

At the end of the recess, the trial court stated that it had done some research and noted that State v. Lemacks, 996 S.W.2d 166 (Tenn. 1999), held that the State did not have to allege a theory of criminal responsibility in the indictment. Defense counsel again argued

that the defense was not provided sufficient notice regarding the theory of criminal responsibility. The State responded that the appellant was put on notice because one of his accomplices, Gabriel Housewright, testified during the preliminary hearing; that the State had provided ample discovery; that the affidavit of complaint alleged the theory of criminal responsibility; and that the State had never alleged the appellant personally committed any of the acts. The court agreed with the State and allowed it to proceed under a theory of criminal responsibility. Thereafter, the State moved to dismiss count four of the indictment, and the trial court granted the motion.

Initially, we note that the appellant styles his challenge to the indictment as follows: "Whether after the Court's dismissal of Count Four, Accessory After the Fact, the Indictment sufficiently put the Defendant on notice that he would be liable for the acts of Gabriel House[w]right and Mark Harrell." However, in the argument section of his brief, the appellant never mentions the dismissal of count four or how it affects the validity of the indictment.

Regarding whether the indictment was sufficient to put the appellant on notice, we note that the Sixth and Fourteenth Amendments to the United States Constitution and article I, section 9 of the Tennessee Constitution afford an accused the right to be informed of the nature and cause of the accusation against him or her. See State v. Hill, 954 S.W.2d 725, 727 (Tenn. 1997). Generally, an indictment is valid if the information contained therein provides sufficient information "(1) to enable the accused to know the accusation to which answer is required, (2) to furnish the court adequate basis for the entry of a proper judgment, and (3) to protect the accused from double jeopardy." Id. With the decline of common law offenses and the advent of statutory offenses, strict pleading requirements are no longer necessary. Id. at 727-28. "Hill and its progeny leave little doubt that indictments which achieve the overriding purpose of notice to the accused will be considered sufficient to satisfy both constitutional and statutory requirements." State v. Hammonds, 30 S.W.3d 294, 300 (Tenn. 2000).

In support of his contention that the State should have alleged criminal responsibility in the indictment, the appellant cites State v. Barnes, 954 S.W.2d 760 (Tenn. Crim. App. 1997). In Barnes, the defendant and the victim were divorcing and were involved in a bitter custody dispute. Id. at 762. The defendant and a friend, Stanley Harris, entered the victim's residence to take physical custody of the child. Id. A fight ensued, during which the defendant struck the victim with a stick, burned him on the nose with the hot lightbulb of a lamp, and bit his arm. Id. Harris struck the victim in the head with a baseball bat. Id. at 763. The victim fatally shot Harris with a rifle. Id. The defendant was charged with aggravated assault of the victim. Id. On appeal, the defendant alleged that the indictment was insufficient to put her on notice regarding whether she was charged for her own actions or for criminal responsibility for the actions of Harris. Id. This court acknowledged that generally,

- 9 -

"[t]he theory by which the state seeks to hold the defendant responsible for the criminal act is not a necessary inclusion in the indictment." Id. at 763-64 (internal quotations and citation omitted). This court explained that

> because *only* the principal's criminal conduct establishes "the [substantive] offense," an indictment is constitutionally sufficient if the "aider" is charged as a principal, even though the State's theory of criminal responsibility is not set forth therein. In this situation, the "aider" may not be heard to complain of prejudice from insufficient notice as the alleged criminal conduct constitutes but a single offense.

Id. at 764. This court stated, however, that the indictment in Barnes "arguably present[ed] two separate offenses committed by two separate criminal actors." Id. This court concluded that "[e]xcluding the 'principal's' conduct from the 'aider's' conduct would not extinguish all criminal activity"; therefore, the indictment failed to provide sufficient notice of the acts the accused should be prepared to defend against. Id.

The State alleges that Barnes is not applicable and that the instant case is more analogous to State v. Lemacks, 996 S.W.2d 166 (Tenn. 1999), which was issued by our supreme court two years after Barnes. In Lemacks, the defendant attended a party with friends, during which they drank alcohol. Id. at 168. When they left the party in the appellant's vehicle; either the defendant or another man was driving. Id. The vehicle ran off the road, a trooper arrived at the scene, and the defendant was arrested for driving under the influence (DUI). Id. Our supreme court explained that "criminal responsibility is not a recognizable offense in itself, but is solely a theory by which the State may hold the defendant liable for the principal offense committed by another." Id. at 173. The court further explained that "[a]n indictment that charges an accused on the principal offense 'carries with it all the nuances of the offense,' including criminal responsibility." Id. (quoting State v. Johnson, 910 S.W.2d 897, 900 (Tenn. Crim. App. 1995)). Therefore, the court held that the indictment, which described the offense as well as the time, date, and location where the offense occurred, was valid. Id. at 172-73.

We agree with the State that the instant case is analogous to Lemacks. The indictment described the nature of the offenses as well as the time and place the offenses occurred. We conclude that because "[a] separate indictment for criminal responsibility is unnecessary when a defendant has been indicted for the primary offense," the indictment against the appellant was valid and provided sufficient notice of the crimes alleged. State v. Sherman, 266 S.W.3d 395, 408 (Tenn. 2008) (citing Lemacks, 996 S.W.2d at 170; Barnes, 954 S.W.2d at 763). Moreover, as the State notes, the appellant could have requested a bill of particulars. The appellant is not entitled to relief on this issue.

B. Sufficiency of the Evidence

On appeal, a jury conviction removes the presumption of the appellant's innocence and replaces it with one of guilt, so that the appellant carries the burden of demonstrating to this court why the evidence will not support the jury's findings. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The appellant must establish that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e).

Accordingly, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. See State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). In other words, questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, and not the appellate courts. See State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990).

The guilt of a defendant, including any fact required to be proven, may be predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. See State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). Even though convictions may be established by different forms of evidence, the standard of review for the sufficiency of the evidence is the same whether the conviction is based upon direct or circumstantial evidence. See State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011).

The appellant was charged with burglary of an automobile; theft of property valued over $1,000; and vandalism of property valued over $1,000. A person commits burglary who, without the effective consent of the property owner, enters any automobile with intent to commit a theft. Tenn. Code Ann. § 39-14-402(a)(4). A theft of property occurs when a person, with the intent to deprive the owner of property, knowingly obtains or exercises control over the property without the owner's effective consent. Tenn. Code Ann. § 39-14-103. Vandalism occurs when "[a] person . . . knowingly causes damage to or the destruction of any real or personal property of another . . . knowing that the person does not have the owner's effective consent." Tenn. Code Ann. § 39-14-408(a). For the purposes of the vandalism statute, "'[d]amage' includes, but is not limited to: . . .[d]estroying, polluting or contaminating property[] or . . . [t]ampering with property and causing pecuniary loss or substantial inconvenience to the owner or a third person . . . ." Id. at (b)(1)(A) and (B).

As we stated earlier, the State proceeded under a theory of criminal responsibility. "A person is criminally responsible as a party to an offense if the offense is committed by the person's own conduct, by the conduct of another for which the person is criminally

responsible, or by both." Tenn. Code Ann. § 39-11-401(a). Tennessee Code Annotated section 39-11-402(2) provides that an appellant is criminally responsible for the actions of another when, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, [the appellant] solicits, directs, aids, or attempts to aid another person to commit the offense." The appellant must "'in some way associate himself with the venture, act with knowledge that an offense is to be committed, and share in the criminal intent of the principal in the first degree.'" State v. Maxey, 898 S.W.2d 756, 757 (Tenn. Crim. App. 1994) (quoting Hembree v. State, 546 S.W.2d 235, 239 (Tenn. Crim. App. 1976)). The appellant's requisite criminal intent may be inferred from his "presence, companionship, and conduct before and after the offense." State v. McBee, 644 S.W.2d 425, 428 (Tenn. Crim. App. 1982). An appellant convicted under a criminal responsibility theory "is guilty in the same degree as the principal who committed the crime" and "is considered to be a principal offender." Lemacks, 996 S.W.2d at 171.

The proof adduced at trial revealed that the appellant and Gabler had been embroiled in a bitter divorce, during which they disputed who would retain ownership of the Trailblazer. The parties ultimately decided that Gabler would keep the vehicle and pay the appellant $2,500. As of the time of the incident, she had paid only $200. On the night of October 31, 2011, the appellant drove Housewright and Harrell to his mobile home. The appellant complained about his divorce and stated that the Trailblazer was his and that he wanted it back. He said he had a key to the vehicle and knew where the vehicle was located. The appellant supplied Harrell and Housewright with cans of spray paint, then he and his girlfriend drove them to Gabler's neighborhood and let them out at a stop sign. The appellant was seen at that location by Gabler's neighbor, Hale. Harrell and Housewright went to Gabler's house, jumped a fence, and spray painted the lower level of the house. Afterward, Harrell and Housewright got into the Trailblazer and sped away, making the tires squeal. Around that time, Gabler heard squealing tires outside. Harrell and Housewright drove to Walmart, where Harrell took a DVD player from the vehicle, slashed the vehicle's tires, spray painted the vehicle, and discarded the paint cans on top of a storage facility. Housewright and Harrell met the appellant and his girlfriend, who had arrived at Walmart shortly after Housewright and Harrell. The next day, Gabler saw that purple paint had been sprayed on a door, two windows, and some bricks on the house. The Trailblazer was found in a Walmart parking lot. The vehicle, including the windshield, side windows, and back window, was covered with purple spray paint. All four tires had been punctured and were flat. A DVD player and a GPS were missing from the vehicle. The security video corroborated Housewright's version of events and showed the appellant driving past the Trailblazer as he left Walmart. The police later found a can of purple spray paint on top of the storage facility. Gabler said that the vehicle was worth over $1,000. The appellant confirmed that they had purchased the "salvaged" vehicle for approximately $2,300. Gabler replaced the vehicle's four tires for $400. An estimate of the cost to repair the paint on the vehicle was $948 and to have the house pressure washed was $400. We conclude that from

- 12 -

the foregoing, a reasonable jury could have found the appellant guilty beyond a reasonable doubt of burglary of an automobile, theft, and vandalism under a theory of criminal responsibility.

### III.  Conclusion

In sum, we conclude that the indictment provided sufficient notice to the appellant and that the evidence was sufficient to sustain his convictions.  Accordingly, we affirm the judgments of the trial court.

_____
NORMA MCGEE OGLE, JUDGE